AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>SUBJECT DEVICES 1 through 10, identified in<br>ATTACHMENT A, located at the Drug Enforcement<br>Administration, 1 Prestige Pl, #450, Miamisburg, Ohio | )<br>)<br>)<br>)<br>)<br>)  Case No. **3:17 mj 468** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Possession with Intent to Distribute and Distribution of Controlled Substances |
| 21 U.S.C. 846 | Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alex P. Hillman, Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/5/17

_____
*Judge's signature*

City and state: Dayton, Ohio

Michael J. Newman, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>SUBJECT DEVICES 1 through 10, identified in ATTACHMENT A, located at the Drug Enforcement Administration, 1 Prestige Pl, #450, Miamisburg, Ohio | Case No.  **3 : 17 mj  468** |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Alex P. Hillman, being duly sworn, hereby state:

### INTRODUCTION

1.       I am a Task Force Officer with the Drug Enforcement Administration (DEA), and have been since October, 2014.  I am a Detective with Troy Police Department (TPD) and have been employed by TPD since 2003.  I have conducted and participated in complex drug trafficking conspiracy and money laundering investigations which have resulted in arrests; execution of search warrants that resulted in the seizure of narcotics, narcotics proceeds and other evidence of narcotics trafficking activities; and supervised the activities of cooperating sources (CS) that have provided information and assistance resulting in narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate.  They usually attempt to conceal their identities, the locations at which they reside, and where they store controlled substances and the illegal proceeds derived from their drug trafficking activity.  Through training and experience, I am familiar with the practices of narcotics distributors, whereby they attempt to conceal the true nature, source, and location of proceeds of illegal activity, commonly referred to as money

1

laundering. I have received training on numerous subjects related to the internet, social media, smart phones, smart phone applications, SMS/MMS, cellular phone tolls, Title III intercepts, Penlink, and computer programming languages. I am familiar with and have working knowledge of the internet, social media websites, online commerce, smart phones, smart phone applications, SMS, and MMS. Affiant has personal accounts of and is a daily user of the aforementioned items. I have utilized mobile tracking devices (MTD) in the past and have analyzed the data collected from such devices.

## PURPOSE OF THE AFFIDAVIT

2.     Along with other agents and task force officers of the DEA, I am currently involved in an investigation of the distribution of controlled substances, including cocaine and fentanyl, by Robert Wilton Stroud ("STROUD"). I make this affidavit in support of an application for a search warrant for the following devices, as there is probable cause to believe that evidence of a crime, contraband or fruits of a crime, and property designed for use, intended for use, or used in committing a crime—namely, violations of 21 U.S.C § 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribute controlled substances)—exists and can be found on these devices, which are currently located at the DEA office at 1 Prestige Pl, #450, Miamisburg, Ohio:

a. VERIZON CELLULAR PHONE (flip) MEID: A0000047769498 (hereinafter referred to as "**Subject Device-1**");

b. LG VERIZON CELLULAR PHONE SN:702CQFT0785915 (hereinafter referred to as "**Subject Device-2**");

c. APPLE IPHONE CELLULAR PHONE IMEI: 354411069042969 (hereinafter referred to as "**Subject Device-3**);

2

d. SAMSUNG GALAXY S7 CELLULAR PHONE IMEI: 357751076659132 (hereinafter referred to as "**Subject Device-4**");

e. LG VERIZON CELLULAR PHONE SN: 609UTKE0053093 (hereinafter referred to as "**Subject Device-5**");

f. APPLE IPHONE CELLULAR PHONE FCC ID: BCG-E3087A (hereinafter referred to as "**Subject Device-6**");

g. SAMSUNG CELLULAR PHONE Model: SMB311V, SKU: SMB311VZPP, HEX: A00000477AB03 (hereinafter referred to as "**Subject Device-7**");

h. SAMSUNG CELLULAR PHONE Model: SM-B311V, SKU: SMB311VZPP, HEX: A00000476A33 (hereinafter referred to as "**Subject Device-8**");

i. SAMSUNG CELLULAR PHONE Model: SMB311V, HEX: A00000477043B3 (hereinafter referred to as "**Subject Device-9**");

j. SAMSUNG CELLULAR PHONE Model: SMB311V, SKU: SMB311VZPP, ID: A3LSMB311V, HEX: A0000047768585 (hereinafter referred to as "**Subject Device-10**");

3.    This affidavit is intended to show that there is sufficient probable cause for the above-described search warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter.  The facts and information contained in this affidavit are based on my personal knowledge, my training and experience, my interviews of various witnesses, including law enforcement personnel who participated in the investigation, and my review of certain records and documents.  For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

4.    A list of the specific items to be seized from the above-described items is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.

5.      Based on my training and experience, as detailed above, I believe that there is probable cause to believe that the items listed in Attachment A will be found on the above-described devices.

## **INVESTIGATION**

6.      From February 28, 2017, to July 12, 2017, the DEA Dayton Resident Office, pursuant to court orders, monitored communications occurring over multiple telephones used by Carlton Dion Harris II ("HARRIS) and Robert Wilton Stroud ("STROUD"). During the investigation, HARRIS and STROUD communicated on multiple cellular phones in furtherance of drug trafficking activity.

7.      Throughout the investigations, investigators have determined that STROUD used multiple phone numbers in furtherance of drug trafficking activity. On March 21, 2017, while monitoring a court-authorized pen register for telephone number (980) 318-7977, a telephone number that agents identified as belonging to STROUD, case agents discovered STROUD was forwarding his incoming calls to telephone number (312) 720-8168, which was a pre-paid Verizon cellular phone that STROUD used for a short amount of time.

8.      Beginning on or about February 28, 2017, DEA obtained court orders authorizing agents and officers to monitor wire communications occurring over telephone number (937) 838-7736, a number associated with a cellular telephone belonging to HARRIS. On April 14, 2017, at approximately 5:03 p.m., agents monitored a communication between phone number (937) 838-7736 and phone number (704) 775-1500, a phone number identified as being used by STROUD, and that was subscribed to Stroud Enterprise, LLC. The following is a transcription of the cellular call between HARRIS and STROUD:

STROUD:     "Whats up?"

HARRIS:     "Yeah...They ain't told you?"

STROUD:     "Wha?"

HARRIS:     "Man, I look like I'm half Black, half Chinese, Man......"

STROUD:     "Oh, what happenin'?"

HARRIS:     "huh?"

STROUD:     "what happened?"

HARRIS:     "I'm losing all my weight"

STROUD:     "That's alright."

HARRIS:     "Yeah.  Losing this weight crazy...workin out crazy...They told me you been slackin..."

STROUD:     "Nah, I mean, uh, thats like this week, a couple times this week... I gotta do, I just got a do a lot of cardio..... I gotta run a lot...
get the heart rate up"

HARRIS:     "You said you gotta get your heart rate up"

STROUD:     "I run a lot when I work out"

HARRIS:     "You don't want to run!"

STROUD:     "No, I been runnin, I run every night"

HARRIS:     "Every night?"

STROUD:     "yeah...I run every night."

HARRIS:     "No....You supposed to run in the mornin'."

STROUD:     "I, I...I work out in the  morning......U/I...then I work out, then I run at night."

HARRIS:     "Ahhh...Oh.....OK...I went to college...U/I I am U/I go to this block party"

STROUD:     "What?"

HARRIS:     "A block party."

STROUD:     "Columbus?"

HARRIS:     "No  Central."

STROUD:     "Oh"

HARRIS:     "You know, we don't do no 'hood stuff"

STROUD:     "It's warm down there?"

HARRIS:     "Huh?"

STROUD:     "Is it warm there?"

HARRIS:     "Yeah it's hot as hell!"

STROUD:     "Uhhh...."

HARRIS:     "It's supposed to rain tonight though, but it's hot.  It's supposed to be 80
            tomorrow....80 or 84..U/I....something like that.....I know it's hot right
            now, though...."

STROUD:     "yeah...."

HARRIS:     "But I ain't on nothin'."

STROUD:     "What's been goin on?"

HARRIS:     "Nothin'...Chillin'...Watching the news."

STROUD:     "What was that?"

HARRIS:     "Huh?"

STROUD:     "What was that?"

HARRIS:     "I'm talking about watching the news."

STROUD:     "Say, what happened yesterday?"

HARRIS:     "What?"

STROUD:     "huh?"

HARRIS:     "Somebody got hit with twenty-one, twenty-one, twenty one squares
            Fetty, then 120 bands, a strap, took 4 cars, a square...a square of him, a
            square of her.....I said damn!   Caught them in Harrison Twp."

STROUD:     "Somebody told on them, huh?"

HARRIS:     "Hell yeah!  I said, man...don't nobody get caught like that...they...they
            pants were down."

STROUD:     "Nah, nah, looks somebody told on them."

HARRIS:     "They pants was down..I said Damn!"

STROUD:     "U/I...somebody said"

HARRIS:     "You know it gonna be slow in the neighborhood:"

STROUD:     "Huh?"

HARRIS:     "It's about to be slow in the neighborhood."

STROUD:     "Never."

HARRIS:     "Huh?"

STROUD:     "Never."

HARRIS:     "Shit."

STROUD:     "That ain't shit."

HARRIS:     "Somebody..somebody...somebody...Somebody else got, uh, around with 20."

STROUD:     "Yeah, that ain't shit."

HARRIS:     "Man..you didn't hear about that shit in Greene county?"

STROUD:     "nuh uh"

HARRIS:     "They got the 20 suspects with the hunnid charges."

STROUD:     "huhn uh"

HARRIS:     "Their slow...it's gonna get slow."

STROUD:     "Nah..never."

HARRIS:     "Watch, Pop..I'm tryin to tell you."

STROUD:     "Huh?"

HARRIS:     "I'm tryin to tell you right now,  theres not so many niggas jumping, thats why i'm saying that...so whoever they was...(walked over by Pops)"

STROUD:     "It ain't cuz of that though!  It ain't cuz of that!"

HARRIS:     "I'm talkin'about whoever hand they was hittin' its about to get slow"

STROUD:     "Nah , cause if it was, they wouldn't a had.... They must a just got it....they was only givin' them like 1"

HARRIS:     (Laughter)

STROUD:     "Had to been..."

HARRIS:     (laughter) "thats what i said..."

| | |
|---|---|
| STROUD: | "They wasn't... They wasn't doing no good....U/I....Even if U/I......" |
| HARRIS: | "you talking about..." |
| STROUD: | "If somebody met..U/I they wouldn't a had all that....U/I...all that...cause that ain't shit" |
| HARRIS: | "Uh..." |
| STROUD: | "For real!" |
| HARRIS: | "I'm sayin', you know, niggas down here ain't jumpin like that...There ain't too many niggas that's, that's, that's, thats rockin' like that" |
| STROUD: | "Yeah...Yeah.." |
| HARRIS: | "The Fetty ain't rockin like that....thats what I'm sayin like...you know what I'm sayin? ain't too many niggas...Thats what i was tellin Joey...Even with that they was probably dishing about 3 here..... ten here, U/I here, but with all them niggas and all the niggas that they was fucking with it's about to get slow" |
| STROUD: | "No...We'll fuck the city up." |
| HARRIS: | "Huh?" |
| STROUD: | "No, it be alright." |
| HARRIS: | "You gonna see..." |
| STROUD: | "It'll be alright..." |
| HARRIS: | "I'm like..... man! but they didn't even talk about them like that....They talking about..about.. they talking about...about ..about...my boy..I say these niggas got caught with 21...he got caught with 2....(Call drops abruptly)" |

END OF CALL

9.     Based on training, experience, an knowledge in this investigation, your Affiant

believes this conversation involves HARRIS and STROUD discussing a recent drug raid in

which 21 kilograms of Fentanyl, $120,000.00, a firearm, 4 vehicles, 1 kilogram of Heroin, and 1

kilogram of Cocaine were seized. ("Twenty one squares Fetty, then 120 bands, a strap, took 4

cars, a square...a square of him, a square of her.....I said damn!   Caught them in Harrison Twp.")

HARRIS references drug sales slowing down as a result of the drug raid and STROUD reassures

HARRIS that drug sales will not slow down and that the drugs seized were small compared to the amount of narcotics that STROUD distributes. STROUD reassures HARRIS that they will sell large amounts of narcotics. ("No...We'll fuck the city up.").

10. Beginning on or about May 31, 2017, DEA obtained court orders authorizing agents and officers to monitor wire and electronic communications occurring over telephone number (704) 775-1500, the phone number that was identified as being used by STROUD and that was subscribed to Stroud Enterprise, LLC. On June 15, 2017, agents monitored communications occurring over phone number (704) 775-1500. On that date, several calls were intercepted in which STROUD could be heard communicating on an unknown second cellular phone, while on the intercepted live call. In the background conversations, STROUD was heard giving instructions to a third party to travel to Chicago, check-in to the Omni Hotel, request a late check-out, and to drive another person's vehicle (identified as K.T., as discussed below) to a narcotics transaction. On July 15, 2017, DEA Chicago established physical surveillance of the vehicle owner (K.T.) and the third party some time later. Surveillance units witnessed the third party conduct a drug transaction and later conducted a traffic stop on the third party, who was using K.T.'s vehicle. During the traffic stop, 5 packages of suspected cocaine were located and seized in a red Macy's bag during a consent search of the vehicle.

11. After the drug transaction and traffic stop, several more intercepted wire communications and electronic communications occurring over (704) 775-1500 referenced the drug transaction and the 5 packages of suspected cocaine. On June 15, 2017, at approximately 1:37 p.m., agents intercepted an outgoing call from STROUND's (704) 775-1500 number to (312) 619-7968, a cellular number known to be used by an individual herein referred to as K.T.,

and that is subscribed to an address in Chicago, Illinois. The following is a transcription of the cellular call between STROUD and K.T.:

| | |
|---|---|
| K.T.: | WHAT UP? |
| STROUD: | [ASIDE: AIGHT, I GOT YOU.] |
| | [BACKGROUND: VOICES] |
| | HELLO? |
| | [ASIDE: I GOT YOU IN A MINUTE, I GOT YOU IN A MINUTE.] |
| | [BACKGROUND: VOICES] |
| | HELLO? |
| K.T.: | YEAH? |
| STROUD: | HEY , WHERE YOU AT? |
| K.T.: | ON THE BLOCK. |
| STROUD: | OH GET YOU, GET OUT THAT CAR MAN, GO TO GO [STAMMERS]  TO... YOU [STAMMERS] ON... WHERE YOUR CAR PARKED AT? |
| K.T.: |  IN FRONT OF MY MOMMA'S HOUSE. |
| STROUD: | GO TO THE TRUNK. |
| K.T.: | RIGHT. |
| STROUD: | POP THE TRUNK AND LOOK IN THAT BAG. YOU FUCKED, OH MAN! |
| | [BACKGROUND: NOISES] |
| K.T.: | GO IN THE TRUNK AND LOOK IN THE BAG? |
| STROUD: | YEAH. |

K.T.:        AIGHT, WHAT KIND OF BAG?

STROUD:     MAN, JUST GO TO THE TRUNK, MAN.

K.T.:        I AM, YOU JUST GOT TO TELL ME WHAT KIND OF
             BAG.

STROUD:     JUST LOOK IN THERE.

             [BACKGROUND: CAR BEEPING]

             [BACKGROUND: RUMMAGING]

K.T.:        IT'S DIFFERENT BAGS, FUCKING BAGS [U/I].

STROUD:     [ASIDE: ASK HER WHAT KIND OF BAG IT WAS.]

             [BACKGROUND: UM: A MACY'S BAG]

             A MACY'S BAG.

K.T.:        AIN'T EVEN A MACY BAG IN HERE.

             [VOICES OVERLAP]

STROUD:     HUH?

             [BACKGROUND: VOICES]

K.T.:        NOT A MACY'S BAG IN HERE.

STROUD:     [ASIDE: IS A WHAT?]

K.T.:        IT'S NOT A MACY'S BAG IN HERE.

             [VOICES OVERLAP]

STROUD:     IT'S A PAPER BAG.

K.T.:        [RUMMAGING] HEY, WHAT'S IN THE PAPER BAG?

STROUD:     YOU GET THE PAPER BAG?

K.T.:        [U/I] I'M IN THE TRUNK MAN. [RUMMAGING] IN THE TRUNK.

11

STROUD:    IT SHOULD BE FIVE (5) OF THEM THINGS.

K.T.:    HUH?

STROUD:    IT SHOULD BE THEM THINGS IN THE TRUNK.

K.T.:    NAH, AIN'T NOTHING IN THE TRUNK. [RUMMAGING]

[BACKGROUND: VOICES]

STROUD:    [ASIDE: HUH?]

K.T.:    THEY AIN'T NOTHING IN THE TRUNK.

[BACKGROUND: RUMMAGING]

[BACKGROUND: VOICES]

STROUD:    [ASIDE: NAH.]

K.T.:    YOU HEAR ME?

STROUD:    [U/I]

K.T.:    I'M IN THE TRUNK, NIGGA, WHAT THE FUCK.

[BACKGROUND: RUMMAGING]

YOU HEAR ME?

STROUD:    HUH?

K.T.:    I'M IN [AUDIO GLITCH] NOTHING IN THE TRUNK.

STROUD:    IN YOUR CAR?

K.T.:    I'M IN MY CAR.

STROUD:     IT'S A BAG IN THERE, MAN.

K.T.:    MAN, I'M IN IT... MAN LOOK, I'M IN HERE.

[BACKGROUND: RUMMAGING.]

[BACKGROUND: SHUT UP NIGGA.]

[BACKGROUND: RUMMAGING.]

[BACKGROUND: DOOR SLAMS SHUT.]

[BACKGROUND: UM: MAN... NO, NO

[LAUGHS] AIN'T NO MACY'S BAG.

STROUD:    IT'S A BAG IN THERE.

[BACKGROUND: VOICES]

K.T.:       [BACKGROUND: RUMMAGING.]

[BACKGROUND: UM: [U/I] FUCKING BAG.]
[BACKGROUND: RUMMAGING]

THEY.... WHAT, HEY IF IT'S A BAG, THEY TOOK IT. IT AIN'T IN HERE.

STROUD:    [ASIDE: ASK HER IF SHE'S SURE THEY DIDN'T TAKE IT.]

K.T.:       HUH? WHAT YOU SAY? I'M [STAMMERS] EVERYTHING I PULLED OUT OF THE TRUCK IS ON THE FLOOR.

[VOICES OVERLAP]

[BACKGROUND: VOICES]

[BACKGROUND: VIBRATION SOUND]

STROUD:    THEY HAD TO CAUSE...

[BACKGROUND: UM: WHAT ARE YOU DOING [U/I].]

HELLO?

K.T.:       YEAH, EVERYTHING, EVERYTHING THAT'S IN THE TRUNK, IT'S ON THE FLOOR. [BACKGROUND: RUMMAGING]

[BACKGROUND: VOICES]

13

STROUD:     THEY HAD TO BEEN, SHE MUST...

K.T.:       SHE THOUGHT THEY LEFT... THEY... YOU
            THOUGHT THEY LEFT SOME WORK IN HERE?

            [BACKGROUND: UM: IT'S A [U/I] SHUT UP.]

STROUD:     HELLO?

K.T.:       YEAH.

STROUD:     YEAH. [ASIDE: WHAT?]

K.T.:       MAN, AIN'T NOBODY LEAVING NO
            MOTHERFUCKING... MAN, NOBODY LEAVING NO
            WORK IN NO CAR. [BACKGROUND: RUMMAGING]
            THEY, THEY GETS WORK THEY LOCKING HER ASS
            UP.

STROUD:     SO WHERE THE [U/I] AT?

K.T.:       HUH?

STROUD:     SO WHERE'S THE [U/I] THEY GET?

K.T.:       YEAH, THEY GOT IT. WHAT THE FUCK YOU
            MEAN?

STROUD:     [ASIDE: ASK [U/I]. HUH?]

K.T.:       HUH?

STROUD:     HELLO? [ASIDE: ASK HER DID THEY UM... [U/I].
            [U/I] ME.]

            [BACKGROUND: UM: [U/I].]

            [ASIDE: [U/I].]

K.T.:       YEAH. [BACKGROUND: UM:[U/I].]
            [BACKGROUND: DOORS SLAMS.]
            NOTHING IN THIS MOTHER FUCKER.

STROUD:     YOU SURE? [BACKGROUND: UM: [U/I].]

K.T.:      HOW DID SHE KNOW WHAT KIND OF BAG IT WAS
           THEN?

           [BACKGROUND: NOISE]

           HUH?

           [BACKGROUND: UM: [U/I].]

STROUD:    [ASIDE: SO THEY DIDN'T POP THE TRUNK AT ALL?]

           [BACKGROUND: RUMMAGING.]

           [ASIDE: HEY TELL HER TO TEXT EVERYTHING THAT
           HAPPENED TO THIS... ON YOUR PHONE. TYPE IT IN...TELL HER
           TO TYPE IT ON YOUR PHONE FUCK THAT]

           [BACKGROUND: RUMMAGING.]

           SHE SAID THEY DIDN'T GET IT.

           [BACKGROUND: RUMMAGING.]

           [BACKGROUND: UM: SOMEBODY AIN'T GONNA GET [U/I].]

           HELLO?

K.T.:      YEAH?

           [PAUSE]

STROUD:    WHAT THE HELL YOU DOING?

K.T.:      HUH?

STROUD:    WHAT THE HELL YOU DOING?

K.T.:      I AIN'T DOING NOTHING, SHIT. AIN'T NOTHING IN
           HERE. [BACKGROUND: NOISE] YOU TOLD ME TO
           LOOK IN THE TRUNK, NIGGA, I, I GOT A BIG
           TRUNK. BUNCH OF GARBAGE IN HERE, BUT...
           AIN'T NO MACY'S BAG IN HERE. [BACKGROUND:
           RUMMAGING.]

STROUD:    BACKGROUND: UM: [U/I].]

15

[ASIDE: YEAH? HUH?]

[BACKGROUND: RUMMAGING.]

HELLO? SO YOU LOOKED THROUGH EVERYTHING?

K.T.:      HUH?

[VOICES OVERLAP]

STROUD:      YOU LOOKED THROUGH EVERYTHING?

K.T.:      YEAH.

[BACKGROUND: VOICES.]

STROUD:      [ASIDE: HEY, WHY YOU SO LOUD MAN?]

[BACKGROUND: RUMMAGING.]

[BACKGROUND: VOICES.]

[BACKGROUND: LAUGHS.]

[BACKGROUND: VOICES.]

HOLD ON BIG FELLA.

[CALL DROPPED]

[END OF CONVERSATION]

[END OF CALL]

12.     Based upon experience, training and knowledge of this investigation, as well as court-authorized interception of communications over STROUD's phone, your Affiant believes that in the above call STROUD instructs K.T. to search K.T.'s trunk for the 5 packages of cocaine in a paper Macy's department store bag. K.T. can be heard rummaging through his vehicle and tells STROUD the cocaine ("work") is not there. K.T. further tells STROUD if the

police had found the "work," they would have locked up the third-party that was driving K.T.'s vehicle.

13.     On July 11, 2017, a traffic stop of STROUD was conducted by Ohio State Highway Patrol (OSHP).  During the traffic stop, **Subject Devices 1, 2, 3, 4,** and **5** were seized from the vehicle in which STROUD was the sole occupant.  STROUD was taken into custody on that date.

14.     On July 11, 2017, a federal search warrant was executed at 4450 Buckeye Lane, Apt. 407, Beavercreek, Ohio.   DEA surveillance of STROUD showed that STROUD had stayed at 4450 Buckeye Lane, Apt. 407, Beavercreek, Ohio, from July 8, 2017, through July 10, 2017.  **Subject Devices 6, 7, 8, 9** and **10** were seized from the residence pursuant to the search warrant.

15.     After STROUD was arrested, agents took the ten Subject Devices to the non-drug evidence room at the DEA Dayton Resident Office.  The Subject Devices remain at that location, which is in the Southern District of Ohio.

16.     Preliminary Lab Results from the DEA North Central Laboratory determined that the 5 brick-shaped substances located in the vehicle during the traffic stop on June 15, 2017 were:  Cocaine (Schedule II), having a gross weight of 6473.2 grams.

## ELECTRONIC DEVICES, STORAGE, AND FORENSIC ANALYSIS

17.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

        b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

        c.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly

transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      d.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      e.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      18.     Based on training and experience, your Affiant knows that drug traffickers frequently use wireless/cellular phones to carry out their activities. They use cellular phones to communicate with customers, their associates, and their suppliers. It is often common for drug traffickers to have multiple phones because certain phones may be used only for certain purposes. For instance, a trafficker may use one phone just to speak to his supplier, while using a different phone to speak only to his customers. This is a counter-surveillance technique

intended to make it harder for law enforcement to identify the user of the phones and his associates. Traffickers commonly use prepaid cellular phones to hide their identity as the user because they generate no billing information, often require little to no identifying information to activate, can sometimes be activated using an alias, and can be easily disposed of should the trafficker believe that law enforcement has identified the phone number.

19. Your Affiant also knows that traffickers commonly text message each other or their customers, such as meeting locations, prices, and other information needed to carry out the sale of drugs (sometimes in code). They commonly store phone numbers for their associates and customers in the electronic phone book/contacts list, often under alias or code names. Your Affiant knows that traffickers, using digital cameras located on their cellular phone, will sometimes use the cellular phone to take photographs or videos of themselves, their location, their product, their firearms or their associates, which can be electronically stored on the cellular phone. Information can also be downloaded from the internet onto the cellular phone, such as email, social network information (like "Facebook"), travel information like maps or directions, or photographs. Call data, such as missed calls, received calls, or dialed calls are often electronically stored in the cellular phone. The information electronically stored on a phone can also be evidence of who possessed or used a cellular phone at a given time, can contain direct evidence of drug trafficking acts, and can help identify drug trafficking locations or associates through GPS data. Affiant is aware that there are tools to extract electronic data from a cellular phone so that law enforcement can review it for items of evidentiary value.

20. Based on my knowledge, training, and experience, your Affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

21. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the subject devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the subject devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer

behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.* Because this warrant seeks only permission to examine devices already in DEA's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

24. Based on the above, your Affiant submits that there is probable cause to believe that **Subject Device-1** through **Subject Device-5**, seized from the vehicle driven by STROUD, and **Subject Device-6** through **Subject Device-10**, seized from 4450 Buckeye Lane Apt. 407 Beavercreek, Ohio, where STROUD was staying while in Dayton, Ohio, will contain phone numbers, text messages, and other electronically stored information related to the possession with intent to distribute and distribution of cocaine, and conspiracy to do the same, as well as information related to drug trafficking associates and other evidence of drug trafficking.

Therefore, your Affiant respectfully requests that a search warrant be issued so that investigators can retrieve the electronic data from **Subject Device-1** through **Subject Device-10**.

Task Force Officer Alex P. Hillman
Drug Enforcement Administration

Subscribed and sworn to me this 5th day of October, 2017.

Honorable Michael J. Newman
United States Magistrate Judge

23

## ATTACHMENT A

## ITEMS TO BE SEARCHED

The following devices seized on July 11, 2017, and located at the Drug Enforcement Administration, 1 Prestige Pl, #450, Miamisburg, Ohio:

1. VERIZON CELLULAR PHONE (flip) MEID: A0000047769498 ("**Subject Device-1**");

2. LG VERIZON CELLULAR PHONE SN:702CQFT0785915 ("**Subject Device-2**");

3. APPLE IPHONE CELLULAR PHONE IMEI: 354411069042969 ("**Subject Device-3**");

4. SAMSUNG GALAXY S7 CELLULAR PHONE IMEI: 357751076659132 ("**Subject Device-4**);

5. LG VERIZON CELLULAR PHONE SN: 609UTKE0053093 ("**Subject Device-5**);

6. APPLE IPHONE CELLULAR PHONE FCC ID: BCG-E3087A ("**Subject Device-6**);

7. SAMSUNG CELLULAR PHONE Model: SMB311V, SKU: SMB311VZPP, HEX: A00000477AB03 ("**Subject Device-7**);

8. SAMSUNG CELLULAR PHONE Model: SM-B311V, SKU: SMB311VZPP, HEX: A00000476A33 ("**Subject Device-8**);

9. SAMSUNG CELLULAR PHONE Model: SMB311V, HEX: A00000477043B3 ("**Subject Device-9**);

10. SAMSUNG CELLULAR PHONE Model: SMB311V, SKU: SMB311VZPP, ID: A3LSMB311V, HEX: A0000047768585 ("**Subject Device-10**).

## <u>ATTACHMENT B</u>

### ITEMS TO BE SEIZED

Evidence of crimes—namely, violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances); and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and to distribute controlled substances). Items to be seized include, but are not limited to, the following documents, digital media, electronic data and records:

1. Call histories, voicemails, contacts or other call logs and information relating to or concerning drug trafficking activity or the sale of illegal drugs including, but not limited to: drug quantities; drug prices; drop locations for money or narcotics; the location of stash houses or bank accounts; the identity or contact information for coconspirators; the purchase, possession or acquisition of assets such as cars, homes, or jewelry; directions to meeting locations.

2. Text messages, SMS, or other written communications or information concerning or relating to the trafficking or distribution of narcotics, including, but not limited to: drug quantities; drug prices; drop locations for money or narcotics; the location of stash houses or bank accounts; the identity or contact information for coconspirators; the purchase, possession or acquisition of assets such as cars, homes, or jewelry; directions to meeting locations.

3. Photographs, videos or other electronic media relating to or depicting the trafficking or distribution of illegal drugs, including, but not limited to: firearms, bulk cash, illegal drugs, associates or other coconspirators, homes or potential stash houses.

4. Evidence of user attribution, including any matter establishing indicia of ownership or use of the cellular telephones, including, but not limited to, photographs, videos, text messages, contacts, call history, logs, phonebooks, saved usernames and passwords, documents, and browsing history.

5. GPS history or applications that have map functions or provide driving directions, which may provide information relating to the location of stash houses or the locations of conspirators.

6. Records evidencing the use of any Internet Protocol address to communicate with any website, including records of Internet Protocol addresses used and records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

1